ACCEPTED
06-14-00230-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
5/14/2015 9:54:17 AM
DEBBIE AUTREY
CLERK

In the
Court of Appeals for the
Sixth District of Texas at Texarkana

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

5/14/2015 11:40:00 AM

DEBBIE AUTREY
Clerk

| | | |
|---|---|---|
| **Nick Feizy,** | § | |
| Appellant | § | |
| | § | |
| v. | § | **No. 06-14-00230-CR** |
| | § | |
| **The State of Texas,** | § | |
| Appellee | § | |

Trial Number 004-80265-2014 in the
County Court at Law No. 4 of Collin County
The Honorable David D. Rippel, Judge Presiding

───────────────

STATE'S BRIEF

───────────────

**Greg Willis**
Criminal District Attorney
Collin County, Texas

**John R. Rolater, Jr.**
Asst. Criminal District Attorney
Chief of the Appellate Division

*Oral argument is not requested*

**Emily Johnson-Liu**
Asst. Criminal District Attorney
2100 Bloomdale Rd., Suite 200
McKinney, TX 75071
(972) 548-4323
FAX (214) 491-4860
State Bar No. 24032600
ejohnson-liu@co.collin.tx.us

**Rachel Tran**
Asst. Criminal District Attorney

# Table of Contents

Index of Authorities...................................................................... ii

Statement Regarding Oral Argument .......................................................1

Statement of the Case ...................................................................1

Statement of Facts.......................................................................1

Summary of the State's Argument.........................................................12

Argument & Authorities ................................................................13

Issue (Sufficiency: linking injuries to Appellant's conduct) ...................13

> The evidence is legally sufficient to establish that Appellant caused the victim bodily injury. Appellant's argument to the contrary overlooks evidence in the record, particularly on his wife's 911 call and in the testimony of the responding officers.

I.   Standard of review........................................................13

II.  The evidence is sufficient to show Appellant caused bodily injury.......................................................................14

Prayer ...............................................................................20

Certificate of Service ...............................................................21

Certificate of Compliance ............................................................21

# Index of Authorities

**Statutes, Codes, and Rules**

TEX. PENAL CODE § 1.07(a)(8) ................................................................ 14

TEX. PENAL CODE § 22.01............................................................... 1, 14

TEX. PENAL CODE § 22.01(a)(1) .......................................................... 14

**Cases**

*Arzaga v. State,*
 86 S.W.3d 767–79 (Tex. App.—El Paso 2002, no pet. ...................... 14

*Bolton v. State,*
 619 S.W.2d 166 (Tex. Crim. App. 1981) ........................................ 17

*Brooks v. State,*
 323 S.W.3d 893 (Tex. Crim. App. 2010) ........................................ 13

*Clayton v. State,*
 235 S.W.3d 772 (Tex. Crim. App. 2007) ........................................ 14

*Goodin v. State,*
 750 S.W.2d 857 (Tex. App.—Corpus Christi 1988, pet. ref'd).......... 17

*Harris v. State,*
 164 S.W.3d 775(Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) . 17

*In re I.L.,*
 389 S.W.3d 445 (Tex. App.—El Paso 2012, no pet.)........................ 19

*In re M.C.L.,*
 110 S.W.3d 591 (Tex. App.—Austin 2003, no pet.) ......................... 19

*Jackson v. Virginia,*
  443 U.S. 307 (1979) ............................................................... 13, 14

*Lane v. State,*
  763 S.W.2d 785 (Tex. Crim. App. 1989) .......................................... 14

*Temple v. State,*
  390 S.W.3d 341 (Tex. Crim. App. 2013) ..................................... 13, 14

## Statement Regarding Oral Argument

Appellant has not asked for argument, and the State likewise waives argument.

## Statement of the Case

Charge.......................Assault Causing Bodily Injury—Family Violence
Tex. Penal Code § 22.01
CR 19

Specific charging language:

> did then and there intentionally, knowingly and recklessly cause bodily injury to [L.F.] by grabbing, scratching and pinching [L.F.] with the defendant's hand

Plea .............................................................................Not Guilty
5 RR 15

Verdict (Jury)...........................................................................Guilty
6 RR 148; CR 393

Punishment (Court).......................180 days' confinement in county jail,
Suspended for 12 months
6 RR 150; CR 394

## Statement of Facts

L.F. returned home from work after picking up her two children from daycare to find her husband, Appellant, asleep on the couch. 5 RR 62. The older boy, who was three years old, had swimming lessons that evening, which everyone in the family usually

1

attended, but that night, Appellant insisted that he would take the boy himself. 5 RR 63. Appellant was angry, and L.F. suspected he was intoxicated. 5 RR 63. As she was later to tell the 911 operator, his intoxication was a daily occurrence. SX 8-1 at 02:24. When Appellant returned home with the boy forty-five minutes later, he was angry at L.F. for not having the boy's dinner ready. 5 RR 64. L.F. did her best to stay out of his way. *Id*.

Appellant had the elder boy in the bathtub, but instead of bathing him, Appellant was picking at his own teeth with a dental tool. 5 RR 64. L.F. got on the elliptical exercise machine, which was within sight of the bathtub. 5 RR 64. When their son said, "I want to see mommy," Appellant slammed the bathroom door. 5 RR 65. L.F. opened it again so she could see her son, but Appellant again slammed it closed. 5 RR 65. At that point, L.F. went into the bathroom and bathed her son. 5 RR 65. Appellant was yelling at her, calling her a "bitch," "cunt," and "worthless." 5 RR 65. L.F. tried to ignore him and focus on the child. 5 RR 65.

When the bath was finished and she was drying her son off, Appellant started pinching her. 5 RR 66. He pinched her with his

hands on her stomach, side, and back and "dug his fingers in." 5 RR 66-68. At the same time, Appellant was laughing, playing, and tickling his son. 5 RR 66. He alternated between playing around with his son and stabbing L.F. with the blunt end of the dental tool, while saying to their child, "Mommy's crazy. Look she's crying." 5 RR 66. Later, when she was asked at trial if his pinching and using the dental tool caused her pain, L.F. answered, "Yes." 5 RR 68.

When L.F. attempted to leave the bathroom to get the boy's clothes, Appellant shut the door to the bedroom, leaving L.F. and their son in the outer part of the bathroom. 5 RR 67. L.F. said, "You're scaring him," and Appellant opened the door and pushed her further back into the bathroom. 5 RR 67. L.F. initially held on to her son, but she later regretted that, wishing she had just given him over to Appellant earlier. 5 RR 68.

At some point, Appellant got the boy. When Appellant walked away, L.F. ran for her phone, which was under the bed, and called 911. 5 RR 67. Appellant also called 911 and claimed that she was crazy and that she was the one who would not stay away from him. 5 RR 71. L.F. told the operator, "My husband hurt me, and he's saying

that I hurt him, and he trapped me in the bathroom with my son." SX 8-1 at 00:13 to 00:20. She said, "He pinched me in the neck and he grabbed my son from me." SX 8-1 at 01:03. When the operator advised her to get out of danger or leave the room if Appellant would not leave, L.F. responded, "I can't get out; he's got me trapped." *Id.* at 01:25. She told the operator that she did not think Appellant was presently intoxicated, although he had been earlier in the evening. *Id.* at 02:24. The operator asked if she needed medical attention, and L.F. said, "No, he doesn't hurt me bad enough to need medical attention, usually . . . I've just got a welt or two." *Id.* at 02:39 to 02:53. She described how Appellant had been laughing and pretending it was a game with her son, when really he was pinching her in the sides. *Id.* at 03:08 to 03:35. She said she was scared, and at one point, the pitch of her voice went up, and she said, "He says he can choke me." *Id.* at 03:50.

Appellant began his call to 911 by saying, "My wife is calling you guys again." SX 8-2. He claimed she was bipolar but when asked if she had ever been diagnosed with the disorder, he admitted that he was not sure. *Id.* He told the operator that no one was drunk, that no

4

one had any weapons, and that everyone was okay. *Id.* He asserted that there was absolutely no reason for L.F. to call 911. *Id.*

Two Plano police officers responded: Officer Alec Newton, who had been an officer for 6 years, and 19-year veteran Officer William Rollins. Appellant told the officers that his wife had made false claims against him, that she had "mental problems," and that she was possibly bipolar. 5 RR 25-26. At first, Appellant told Officer Newton that it had never gotten "physical" between them, but he later claimed that L.F. had pushed him away when they were trying to grab for the child. 5 RR 32, 52. Even before the officer talked to L.F. or saw any marks on her, Appellant volunteered the fact that there were marks on L.F. 5 RR 27. Appellant insisted that they were self-inflicted. 5 RR 28. The officer noted Appellant had a moderate odor of alcoholic beverages on his breath. 5 RR 28.

Officer Rollins found L.F. inside the house, crying and visibly upset. 5 RR 54. He saw marks on the left side of her neck, marks that he described as "rug marks" or "light red marks." 5 RR 54. She told the officer that Appellant had caused those marks. *Id.*

5

Officer Newton saw redness on L.F.'s skin on her right side, which he testified was "consistent with pinching." 5 RR 27. He also testified that she had red marks on the right side of her back, that to him, appeared to be scratches. 5 RR 27, 48. There was also a "light reddening" on both sides of her neck. 5 RR 27, 48. He characterized these injuries as reddening but also as "scratches" or "abrasions." 5 RR 42-43, 48. He testified that the injuries he saw "matched up" with the story L.F. had told him; they were located on her body in the same places that he would expect to see injuries based on the account she had given him. 5 RR 29-30. More specifically, he testified that L.F. had reddened areas where she claimed she had been pinched. 5 RR 47. In his opinion, the injuries he saw looked painful. 5 RR 29-30. In addition, he testified that L.F. had said that her injuries were painful, and he noted in his report that she complained of pain and abrasions. 5 RR 30, 43.

The State introduced eight photographs of L.F. that documented the markings the officers observed. 5 RR 29; SX 1-7. Officer Newton testified that he could see the redness a lot easier in person than in the photographs. 5 RR 33. The prosecutor referenced these pictures

again during L.F.'s testimony about Appellant pinching her and asked L.F., "how did [Appellant] use his hands to cause these injuries?" 5 RR 67-68. L.F. responded, "He dug his fingers in." 5 RR 67.

At the time of trial, L.F. specifically recalled having visible marks on her neck; she was never asked whether she also had marks elsewhere on her body. 5 RR 69. She did not go to the hospital or see a doctor since she believed that her injuries would heal on their own. 5 RR 69.

L.F. denied ever having been treated for bipolar or any other type of mental disorder. 5 RR 71-72. Other than L.F. checking a box on a counselor's intake form that she had once had an eating disorder, the defense had no evidence that L.F. had a mental disorder. 6 RR 105.

During Appellant's case-in-chief, he recalled L.F., who testified that she had spoken to a divorce attorney before the incident on trial, which had happened in November 2013. 5 RR 95-96. She testified that she had been contemplating divorce since September 2013 because she "had been physically harmed often" and she believed her

children were no longer safe. 6 RR 36. But she still loved Appellant and was hoping to still avoid divorce, which is why she on one occasion violated a mutual injunction put in place by the family court judge, an order that required both L.F. and Appellant to stay at least 100 yards away from each other. 6 RR 13-15. In the divorce case, which was still pending at the time of trial, L.F. was asking for exclusive possession of the children and the ability to move their home out of state one day. 6 RR 14, 43. Appellant's divorce attorney testified that a finding of family violence in the case on trial would mean that Appellant could not be joint managing conservator of the children and that possibly, L.F. might be able to move the children anywhere she wanted them to live. 6 RR 56. In the attorney's opinion, false allegations were common in child custody cases. 6 RR 60. While L.F. testified that an expert in the divorce case found she had battered woman's syndrome (5 RR 51), Appellant's divorce attorney believed the expert had said L.F. did not exhibit all of the characteristics of a battered woman. 6 RR 62.

Appellant testified on his own behalf and presented a starkly different account of the November incident. In his version of events,

8

L.F. was the one who was angry that evening. She was yelling at him and demanded that he take the older boy to his swim lesson alone, when he had merely asked, "Honey, do you want me to take him or we can both go?" 6 RR 74-76. When he got home, he fixed the boy's dinner for him while she was getting the younger boy to bed. 6 RR 76. In his version, she was yelling and cursing at him while he was trying to bathe the older boy. 6 RR 77. He only closed the door so that the boy would not hear her obscenities. 6 RR 77. She opened the door, and again he closed it. 6 RR 78. In his version of events, *she* pinched him, not the other way around. According to Appellant, L.F. pinched him in the bicep three times, leaving a mark. 6 RR 79. He offered a photograph of his injury into evidence. DX 6. It depicted a large circular bruise about two inches or more in diameter on the inside of his upper arm. DX 6. Although he admitted he was about 70 pounds heavier than L.F. and taller, he explained that L.F. lifted weights and was strong. 6 RR 78, 108. He denied the existence of any dental tools in the entire house. 6 RR 99. He explained that the officer smelled alcohol on his breath because when he had come home and fixed the boy his dinner, he had had a glass of wine. 6 RR 99, 109.

Appellant claimed that L.F. voluntarily shut herself with the boy in the tiny inner bathroom where the commode was. 6 RR 82. He claimed that as she held the boy and was backing out of the bathroom, she hit her back on the striker pad where the door latch contacted the frame. 6 RR 82. He was also sure that she would have made contact with the window ledge in the small inner bathroom, since the room was very small for two people. 6 RR 82. In Appellant's account, there was also a way to explain the marks on L.F.'s neck. When she finally opened the door to the small bathroom where she had shut herself and the boy, he saw the three year old "pushing off of her neck and yanking on her neckless [sic]." 6 RR 83.

When the police came, Appellant did not tell them anything about L.F. pinching him because he did not want to cause trouble. 6 RR 83. Although he did tell the police about her pushing him, he also recalled his words when asked about pressing charges: "Absolutely not. I don't want to see the mother of my children and my wife in jail." 6 RR 84. As to the incident on Christmas Eve, when she violated the mutual injunction by coming to where he lived, Appellant claimed (contrary to her account) that he had not invited her over and was

shocked when she showed up. 6 RR 95. On cross-examination, he admitted he had a prior assault arrest. 6 RR 110. He also claimed to be surprised at finding L.F. at home the day after the November incident, even though he had brought two witnesses with him to the house to protect himself against her false accusations. 6 RR 92, 110.

The jury ultimately found Appellant guilty of assaulting L.F. as charged in the information. 6 RR 148.

## Summary of the State's Argument

The evidence is legally sufficient to sustain the jury's verdict that Appellant caused his wife bodily injury to her neck, sides, and back by pinching her. Appellant's argument to the contrary overlooks evidence in the record, particularly on his wife's 911 call and in the testimony of the responding officers.

Argument & Authorities

## Issue
(Sufficiency: linking injuries to Appellant's conduct)

The evidence is legally sufficient to establish that Appellant caused the victim bodily injury. Appellant's argument to the contrary overlooks evidence in the record, particularly on his wife's 911 call and in the testimony of the responding officers.

## I. Standard of review

In determining whether the evidence is sufficient, a reviewing court views all the evidence in the light most favorable to the State and determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318 (1979); *Brooks v. State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). It remains the jury's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson,* 443 U.S. at 319. The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Jackson,* 443 U.S. at 319; *Temple v. State,* 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). When the record supports conflicting inferences, the court must presume that the jury resolved the conflicts in favor of

the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Temple*, 390 S.W.3d at 360. The reviewing court evaluates all of the evidence in the record, whether properly or improperly admitted, direct or circumstantial, and determines whether the evidence supports the verdict when viewed in the light most favorable to that verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

## II. The evidence is sufficient to show Appellant caused bodily injury

Section 22.01 of the Texas Penal Code defines the offense of assault as "intentionally, knowingly or recklessly" causing "bodily injury to another, including the person's spouse." Tex. Penal Code § 22.01(a)(1). The Texas Penal Code further defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." Tex. Penal Code § 1.07(a)(8). This definition appears to be purposefully broad and seems to encompass even relatively minor physical contacts so long as they constitute more than mere offensive touching. *Lane v. State,* 763 S.W.2d 785, 786 (Tex. Crim. App. 1989); *Arzaga v. State*, 86 S.W.3d 767, 778–79 (Tex. App.—El Paso 2002, no pet.).

In the instant case, there was a great deal of evidence from which the jury could rationally find that Appellant caused his wife

bodily injury. As is more fully shown below, the State presented testimony and exhibits showing that L.F. sustained red marks in several places on her body, that these marks resulted from his pinching her, and that these marks were painful.

First, there was evidence of red marks. L.F. herself testified that she remembered having visible marks on her neck. 5 RR 69. Whether characterized as scratches, abrasions, welts, or reddening, both officers observed the red marks on L.F.'s neck. 5 RR 27, 48, 54. Officer Newton also saw red marks on her right side and the right side of her back. 5 RR 27, 28. And the jury was able to view the photographs depicting the red marks on L.F.'s neck, side, and back. SX 1-7. Moreover, Appellant acknowledged that L.F. had marks on her. He volunteered that fact to Officer Newton before the officer had talked to L.F. 5 RR 28. Even at trial, Appellant's testimony implicitly acknowledged that L.F. had sustained marks during the November incident as he offered an explanation for every location where L.F. had red marks, whether it was backing into a switch plate or their three-year-old pushing off L.F.'s neck.

There was also ample evidence for the jury to reject Appellant's account of these injuries in favor of the State's theory that Appellant's pinching was the cause of these red marks. The jury heard L.F. tell the 911 operator that Appellant pinched her in the neck. SX 8-1 at 01:03. Officer Rollins also testified that L.F. told him that night that Appellant caused the marks on her neck. 5 RR 54. In addition, L.F. testified at trial that Appellant pinched her in the stomach, side, and back. 5 RR 66. And Officer Newton, who had seen injuries on her neck, back, and side, further corroborated L.F.'s account when he testified that L.F. had reddened areas in the same places where she had told him she had been pinched. 5 RR 47. Also, Officer Newton specifically testified that the marks he saw on her side were consistent with marks caused by pinching. 5 RR 27. Further, it was not surprising that Officer Newton characterized these marks as "scratches." When the prosecutor showed L.F. the photographs taken of her that evening and asked her to explain how Appellant had caused those marks, she testified that Appellant had "dug his fingers

in." 5 RR 67. This evidence was sufficient to establish that Appellant caused L.F. bodily injury.[1]

Even if red marks caused by digging one's fingers in were not alone sufficient to constitute "bodily injury," there was also evidence that these marks were painful. L.F. was asked at trial if Appellant's pinching her and using the dental tool caused her pain, and she answered, "Yes." 5 RR 68. In addition to L.F.'s testimony, Officer Newton testified that the visible injuries captured in the State's photographs looked painful. 5 RR 30. And L.F. told him that night that they were painful. 5 RR 30. He also documented in his report that she had complained of pain and abrasions. 5 RR 29-30. This testimony is sufficient to sustain the jury's guilty verdict. *See Harris v. State*, 164 S.W.3d 775, 785 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (rejecting appellant's challenge to sufficiency of causation and bodily injury when victim only had reddish marks around her neck and scratches and did not require medical attention).

---

[1] The fact of a physical intrusion on the body in the form of a cut or scrape can itself be sufficient evidence of the associated physical pain necessary to show "bodily injury." *Goodin v. State*, 750 S.W.2d 857, 859 (Tex. App.—Corpus Christi 1988, pet. ref'd) (citing *Bolton v. State,* 619 S.W.2d 166, 167 (Tex. Crim. App. 1981)).

Appellant's arguments to the contrary ignore crucial evidence in the record. In arguing that there was no testimony linking the redness on L.F.'s neck to any of his acts, Appellant ignores the 911 call where L.F. stated that Appellant pinched her in the neck. In arguing that the injuries to her side and back were insufficient, he relies solely on the officer's characterization of these injuries as "scratches" and asserts that pinching and poking with the dental tool cannot account for scratches. But Appellant neglects to consider L.F.'s testimony that when he was pinching her, he was digging his fingers in to her, which if he had any nails at all, could leave marks that resembled scratches. Moreover, the jury viewed the photographs for themselves and could have rejected the officer's description of the marks as "scratches," but still believed his testimony that the marks on L.F.'s side were consistent with pinching.

As to Appellant's argument that L.F.'s testimony concerning pain was insufficient, he ignores Officer Newton's testimony that the marks looked painful to him and that L.F. told him they were painful and was complaining of pain. Given this evidence, the jury could rationally conclude that the marks were physically, and not just

emotionally, painful. *See In re I.L.*, 389 S.W.3d 445, 456 (Tex. App.—El Paso 2012, no pet.) (finding evidence sufficient to establish bodily injury from testimony that the victim had red marks and swelling, was in pain and crying as a result of the incident and where photographs were consistent with the physical altercation).

Appellant's reliance on *In re M.C.L.*, 110 S.W.3d 591, 600 (Tex. App.—Austin 2003, no pet.) is unavailing given his failure to consider all of the evidence in the light must favorable to the jury's verdict. Because the evidence is sufficient, Appellant's sole issue should be overruled.

## Prayer

Appellant's trial was without prejudicial error. The State prays that this Court will affirm Appellant's conviction and sentence.

Respectfully submitted,

**Greg Willis**
Criminal District Attorney
Collin County, Texas

**John R. Rolater, Jr.**
Asst. Criminal District Attorney
Chief of the Appellate Division

/s/ Emily Johnson-Liu
**Emily Johnson-Liu**
Asst. Criminal District Attorney
2100 Bloomdale Rd., Suite 200
McKinney, TX 75071
State Bar No. 24032600
(972) 548-4331
FAX (214) 491-4860
ejohnson-liu@co.collin.tx.us

## Certificate of Service

The State has e-served counsel for Appellant, the Honorable Charles Baruch, through the eFileTexas.gov filing system and sent a courtesy copy by e-mail to baruchesq@aol.com on this, the 14th day of May 2015.

/s/ Emily Johnson-Liu
Assistant Criminal District Attorney

## Certificate of Compliance

This brief complies with the word limitations in Texas Rule of Appellate Procedure 9.4(i)(2). In reliance on the word count of the computer program used to prepare this brief, the undersigned attorney certifies that this brief contains 3,568 words, exclusive of the sections of the brief exempted by Rule 9.4(i)(1).

/s/ Emily Johnson-Liu
Assistant Criminal District Attorney